UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| BLAKE MARINE GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No:  0:15-cv-00151-JNE-JJK |
| v. | ) | |
| | ) | |
| CARVAL INVESTORS LLC and CVI | ) | |
| GVF (LUX) MASTER S.A.R.L., | ) | |
| | ) | |
| Defendants. | | |

**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION ...................................................................................................... 1

BACKGROUND ........................................................................................................ 3

STANDARD .............................................................................................................. 8

ARGUMENT ............................................................................................................. 9

    I.     MINNESOTA LAW APPLIES TO THE TORTIOUS INTERFERENCE CLAIM .................................................................................................. 9

        A.    Minnesota's Statute of Limitations is Procedural and Should be Applied as the Law of the Forum .............................................. 9

        B.    Even if the Statute of Limitations Was Substantive, the Choice-Influencing Analysis Weighs in Favor of Minnesota Law ...................... 10

    II.    THE NEW YORK CHOICE OF LAW CLAUSE CONTAINED IN THE CHARTER PARTY DOES NOT APPLY TO THE TORTIOUS INTERFERENCE CLAIM ................................................................... 13

        A.    The Charter Party is Not Governed by New York Law, but rather U.S. Maritime Law and Subject to New York Arbitration Between Blake and Oceanografia ....................................................... 13

        B.    Any Contractual Choice of Law Provision Contained in the Charter Party or MOA Does Not Govern the Tort Claim Against Defendants ...... 14

        C.    If the New York Statute of Limitations Does Govern the Claim, it Should be Tolled Due to Defendants' Efforts to Hide Their Role in the Tortious Interference .................................................... 16

    III.   ALABAMA LAW DOES NOT APPLY TO THE CLAIM BECAUSE THE STATE'S INTEREST IS MINIMAL ................................................ 18

    IV.   DEFENDANTS' TORTIOUS INTERFERENCE WAS NOT JUSTIFIED .......... 20

        A.    Defendants Had No Legal Right or Economic Interest Justifying Their Tortious Interference .................................................... 20

        B.    The Shareholders' Agreement is Irrelevant Where Defendants Used Improper Means to Tortiously Interfere with an Executed Contract and Cause Harm to Oceanografia for Their Own Benefit ...................... 23

    V.    MOTION FOR A MORE DEFINITE STATEMENT ........................................... 25

        A.    Rule 9(b) Pleading Standards Are Not Implicated Here Where Plaintiff's Claim Does Not Allege Fraudulent Acts as an Element of Tortious Interference ..................................................... 25

        B.    The Amended Complaint is Not Vague and Ambiguous as to Require a More Definitive Statement Under Rule 12(e) ......................... 26

CONCLUSION ........................................................................................................ 27

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Air Products & Chemicals, Inc. v. Eaton Metal Products Co.,
    272 F. Supp. 2d 482 (E.D.Pa. 2003) ...................................................................19

Am. Traffic Solutions, Inc. v. B & W Sensors, LLC,
    2014 WL 1272509 (E.D.Mo. 2014)....................................................................25

American Steamship Owners Mut. Protection and Indem. Ass'n v. Dann,
    756 F.3d 314 (4th Cir. 2014) ..............................................................................16

Astor Holdings, Inc. v. Roski,
    2002 WL 72936 (S.D.N.Y. 2002)........................................................................18

Beatie and Osborn LLP v. Patriotic Scientific Corp,
    431 F. Supp. 2d 367 (S.D.N.Y. 2006)..................................................................15

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2007)...............................................................................................8

Berquist v. Medtronic, Inc.,
    364 N.W.2d 887 (Minn. App. 1985)....................................................................12

Blake Marine Group v. Carval Investors LLC,
    No. 13-cv-3184 (S.D.N.Y.).....................................................................................7

Building Erection Services, Inc. v. JLG, Inc.,
    376 F.3d 800 (8th Cir. 2004) ..............................................................................18

Cambio Health Solutions, LLC v. Reardon,
    213 S.W.3d 785 (Tenn. 2006)..............................................................................23

Club Vista Financial Services, LLC v. Maslon, Edelman, Borman & Brand,
    No. 10-3174, 2011 WL 4947629 (D. Minn. Oct. 18, 2011) .................................19

Complaint of American Export Lines, Inc.,
    620 F.Supp. 490 (S.D.N.Y. 1985) .......................................................................16

Cuthbertson v. Uhley,
    509 F.2d 225 (8th Cir. 1975) ................................................................................9

Danielson v. Nat'l Supply Co.,
    670 N.W.2d 1 (Minn. App. 2003)................................................................9, 10, 11

*Frazier v. St. Jude Medical, Inc.*,
   609 F.Supp. 1129 (D. Minn. 1985)....................................................................12

*Furlev Sales & Assocs., Inc. v. N. Am. Auto. Warehouse, Inc.*,
   325 N.W.2d 20 (Minn. 1982).............................................................................24

*Green v. Vermillion Corp.*,
   144 F.3d 332 (5th Cir. 1998) .............................................................................16

*Harman v. Heartland Food Co.*,
   614 N.W.2d 236 (Minn. App. 2000)..............................................................23, 26

*Holden Farms, Inc. v. Hog Slat, Inc.*,
   347 F.3d 1055 (8th Cir. 2003) .......................................................................14, 15

*Huggins v. Stryker Corp.*,
   No. 09-1250, 2013 WL 1191058 (D. Minn. Mar. 25, 2013) ...................................12

*James M. King and Associates, Inc. v. G.D. Van Wagenen Co.*,
   717 F.Supp. 667 (D. Minn. 1989)......................................................................23

*Jepson v. General Casualty Co. of Wisconsin*,
   513 N.W.2d 467 ..........................................................................10, 11, 12, 19

*Kallok v. Medtronic, Inc.*,
   573 N.W.2d 356 (Minn. 1998)......................................................................20, 21

*Kennecott Holdings Corp. v. Liberty Mut. Ins. Co.*,
   578 N.W.2d 358 (Minn. 1998).............................................................................9

*Koch v. Christie's Int'l PLC*,
   669 F.3d 141 (2d Cir. 2012)...............................................................................16

*Lyon Fin. Sers., Inc. v. MBS Mgmt. Servs., Inc.*,
   No. 06-4562, 2007 WL 2893612 (D. Minn. Sept. 27, 2007)...................................26

*Merrill Lynch, Pierce, Fenner & Smith, P.C. v. Greystone Servicing Corp.*,
   No. 06-0575, 2007 WL 2729935 (N.D. Tex. Sept. 18, 2007) .................................25

*Morton v. Becker*,
   793 F.2d 185 (8th Cir. 1986) ...............................................................................8

*Moya v. Kahn*,
   225 F.3d 659 (6th Cir. 2000) .............................................................................16

*Myers v. Government Employees Ins. Co.*,
   225 N.W.2d 238 (Minn. 1974)............................................................................11

iii

*Nesladek v. Ford Motor Co.*,
46 F.3d 734 (8th Cir. 1995) ........................................................................................9, 10, 12

*North Star Universal, Inc. v. Graphics Unlimited, Inc.*,
563 N.W.2d 73 (Minn. App. 1997) ...........................................................................................14

*Northside Mercury Sales & Service, Inc. v. Ford Motor Co.*,
871 F.2d 758 (8th Cir. 1989) ...................................................................................................23

*Oceanografia S.A. de C.V. v. Goodcrane Corp.*,
No. 08-cv-3505 (S.D. Tex. 2008) ..............................................................................................3

*Potthoff v. Jefferson Lines, Inc.*,
363 N.W.2d 771 (Minn. App. 1985) ........................................................................................24

*Prudential Ins. Co. of America v. Metrowide Group*,
No. 08-6438, 2009 WL 9110461 (D. Minn. July 16, 2009) ......................................................9

*Puerto Rico Ports Authority v. Umpiette-Solares*,
456 F.3d 220 (1st Cir. 2006) ....................................................................................................15

*Radisson Hotels Int'l, Inc. v. Westin Hotel Co.*,
931 F.Supp. 638 (D.Minn. 1996) .............................................................................................26

*Ransom v. VFS, Inc.*,
918 F.Supp. 2d 888 (D. Minn. 2013) ......................................................................................27

*Schaaf v. Residential Funding Corp.*,
517 F.3d 544 (8th Cir. 2008) .....................................................................................................9

*Select Comfort Corp. v. Sleep Better Store, LLC*,
838 F. Supp. 2d 889 (D. Minn. 2012) .....................................................................................21

*Sokol Holdings, Inc. v. BMB Munai, Inc.*,
542 F.3d 354 (2d Cir. 2008) ....................................................................................................14

*St. Jude Med., S.C., Inc. v. Biosense Webster, Inc.*,
994 F. Supp. 2d 1033 (D. Minn. 2014) ...................................................................................14

*St Jude Medical S.C., Inc. v. Biosense Webster, Inc.*,
No. A13-0414, 2013 WL 5508389 (Minn. App. Oct. 7, 2013) ....................................9, 20, 24

*Superior Edge, Inc. v. Monsanto Co.*,
964 F. Supp. 2d 1017 (D. Minn. 2013) ...................................................................................15

*Twitchell v. Glenwood–Inglewood Co.*,
131 Minn. 375, 155 N.W. 621 (1915) .....................................................................................24

*United States v. R.J. Zavoral & Sons, Inc.*,
    894 F. Supp. 2d 1118 (D. Minn. 2012) ................................................................23

*Weizman Institute of Science v. Neschis*,
    229 F. Supp. 2d 234 (S.D.N.Y. 2002) ................................................................17

*Winter-Wolff Intern., v. Alcan Packaging Food & Tobacco Inc.*,
    499 F. Supp. 2d 233 (E.D.N.Y. 2007) ................................................................15

**STATUTES**

N.Y. C.P.L.R. § 3120 ................................................................................................7

**OTHER AUTHORITIES**

Fed. R. Civ. P. 9(b) ................................................................................................25

Fed. R. Civ. P. 12(b)(6) ................................................................................9, 21

Fed. R. Civ. P. 12(e) ................................................................................26, 27

Restatement (Second) of Conflict of Laws ................................................................19

## INTRODUCTION

CarVal Investors, LLC ("CarVal") acting with or at the instruction of CVI GVF (Lux) Master S.a.r.l. ("CarVal Lux") (collectively, "Defendants") took acts within the state to knowingly and wrongfully tortiously interfere with an executed bareboat charter contract between plaintiff Blake Marine Group ("Blake") and non-party Oceanografia, S.A. de C.V. ("Oceanografia") as further set forth in the Amended Complaint.  Defendants, themselves corporate residents of Minnesota,[1] object to being held liable for their acts in their home forum, and attempt to characterize this action as a case of forum shopping.  The filing and voluntary dismissal of a prior action in New York does not indicate forum shopping where information in that action raised legal issues suggesting that the case would be more appropriately filed here in Minnesota.  This case is one in which Minnesota law applies to hold powerful Minnesota residents accountable for tortious acts which took place within the state and caused substantial damage to Blake and Oceanografia.

The Minnesota six year statute of limitations for tortious interference is properly applied here as the law of the forum.  The law in Minnesota is that a statute of limitations is procedural and therefore automatically applies within the forum.  Even if the statute of limitations were substantive law subject to a choice of law analysis, Minnesota law would apply.  The factors to be applied to substantive choices of law indicate that Minnesota has an overwhelming interest in this dispute and the application of its own laws to the tortious interference by its own residents.

---

[1] CarVal Investors, LLC is an independent subsidiary of Cargill, Inc., who is the largest privately-owned company in the United States, based in the state of Minnesota (Forbes, "America's Largest Private Companies 2014," available at http://www.forbes.com/largest-private-companies/; *see also* Minneapolis/St/ Paul Business Journal, "List Leaders: Minnesota's 100 largest private companies," available at http://www.bizjournals.com/twincities/news/2014/09/18/minnesota-largest-private-companies.html) and one of the largest employers in the state ("Top Employers Statewide," available at http://mn.gov/deed/business/locating-minnesota/companies-employers/top-employers.jsp).  CarVal has billions of dollars under management through secretive onshore and offshore corporate structures, including co-defendant CarVal Lux.  *See* carvalinvestors.com. CarVal invests in risky, distressed debt in a manner commonly referred to as "vulture investing."

Neither of the alternative choices of law proposed by Defendants – New York or Alabama - is applicable to this case.  The tort claim here is not governed by the contractual choice of law provision between Blake and third party Oceanografia, particularly where the charter party contract is governed by a dispute resolution clause *of contractual disputes* providing for the arbitration of claims under U.S. maritime law.  Defendants' interpretation that the charter party or superseded Memorandum of Agreement ("MOA") is governed by New York law misconstrues the terms of the final contract between Blake and Oceanografia, and in any event, the tort claim here is not sufficiently related to interpretation of the provisions of the charter party to warrant application of any contractual choice of law.

While the Plaintiff is a corporation registered in Alabama, that state has no other contact with the dispute.  Despite Defendants' allegations that the financial harm caused by the tort was felt in Blake's home state, this is an issue of fact which is inappropriate on a motion to dismiss, and in any event would fail to overcome the strong contacts of Minnesota to this case.  Deference should be given to Plaintiff's choice of forum, particularly where the Defendant is unquestionably subject to jurisdiction in that forum, and in fact committed the tort from its principal place of business in that forum.

Blake alleged in its Amended Complaint that there was no justification for Defendants' tortious interference.  Defendants have failed to establish an economic justification under Minnesota or other applicable law for its interference with the contract, where Oceanografia entered into a valid and binding charter party contract with Blake.  The Shareholders' Agreement between Oceanografia and CarVal Lux presented by Defendants does not establish an economic justification, but rather raises many issues of fact and law which need to be determined during this case.  If the Agreement was valid, rather than improperly interfering with the executed and

2

binding contract, CarVal Lux was required to pursue its remedies against Oceanografia in Mexico pursuant to its alleged Shareholders' Agreement for any damages incurred from any alleged violation of the Agreement by Oceanografia. Instead, Defendants, who understood the increased damages they would cost Oceanografia, tortiously ordered the termination of the charter party with Blake in order to substitute their own crane vessel, at a higher contractual rate, substantially harming both Oceanografia and Blake while reaping the economic gains.

## BACKGROUND

As set forth in the Amended Complaint (Dkt. 8), during or before 2007 Oceanografia was awarded one or more contracts with Petrolos Mexicanos ("PEMEX") for offshore oilfield support services, for which it needed a revolving crane to be installed onboard its vessel the M/V Caballo Azteca (the "Vessel"). Am. Compl. para. 12.[2] After the breach of a contract to provide a crane for the Vessel by an entity Goodcrane Corporation, Oceanografia was incurring substantial damages, increasing daily, for its inability to perform the contract with PEMEX. Am. Compl. para. 13; *see also Oceanografia S.A. de C.V. v. Goodcrane Corp.*, No. 08-cv-3505 (S.D. Tex. 2008) (Dkt. 1).

Defendants have provided an Amended Shareholders' Agreement (original Agreement dated December 2007, and amended November 2008) which purports to show a five percent (5%) ownership interest that CarVal Lux had in Oceanografia pursuant to a Bridge Credit Agreement for a short-term loan. Dkt. 21-1 at 5 (A-4). CarVal Lux apparently also had an option to acquire an additional five percent of Oceanografia capital stock. *Id.*

In October 2008, when Blake was first engaged by Oceanografia to negotiate the lease and charter of a barge crane (Am. Compl. Ex. 1-2) to replace the crane which Goodcrane

---

[2] The use of the Caballo Azteca was noted in the contract between PEMEX and Oceanografia. A later contract reflects the substitution of the Caballo Azteca with the OSA Goliath on March 30, 2010, a crane vessel at that time owned by CarVal.

Corporation failed to supply, the original Shareholders' Agreement dated December 4, 2007 between the principals of Oceanografia and CarVal Lux is alleged by Defendants to have been valid and in force.  Clause 12.6 of that Agreement setting for consent rights reads:

> (a) … so long as CarVal [Lux] hold's at least 5% (five per cent) of the capital stock of Oceanografia, the following decisions and actions shall not be taken and/or implemented by Oceanografia…
>
> > (ix) the acquisition or agreement to acquire any capital asset, any lease or agreement to lease real or personal property or any acquisition or agreement to acquire property which would exceed US$50,000,000.00 in one or more single or series of related transactions in Oceanografia or any of its Subsidiaries"

Dkt. 21-1 at 25 (A-24).

In an Amendment to the Shareholders' Agreement dated November 28, 2008, the consent rights for a 5% owner were changed to:

> (ix) the acquisition or agreement to acquire any capital asset, or any acquisition or agreement to acquire property which would exceed US$1,000,000.00 (One million Dollars) in a single or in a series of related transactions in Oceanografia or any of its Subsidiaries;
>
> (xv) any payment to any Person above US$100,000.00 (One hundred thousand Dollars) in a single or in a series of related transactions in Oceanografia or any of its Subsidiaries;

Dkt. 21-1 at 46 (A-45).

As a purported five percent shareholder of Oceanografia, CarVal Lux was aware at this time of the increasing damages being caused to Oceanografia for its failure to procure a crane for the M/V Caballo Azteca pursuant to the PEMEX contract.  Indeed, just two days before, Oceanografia had commenced a lawsuit against Goodcrane Corp. for breach of contract. Amended. Compl. para. 13.  Defendants have not denied knowledge that Oceanografia was being damaged tremendously each day it was unable to perform the PEMEX contract using the Caballo Azteca.

Notwithstanding the change in terms of the original Shareholders' Agreement (whose existence was never disclosed to Blake Marine), Oceanografia executed a letter dated December 15, 2008 authorizing Blake Marine to negotiate with McDermott International Inc. for the charter of a suitable crane barge as provided for in the Maritime Advisory and Services Agreement dated October 28, 2008.  A Memorandum of Agreement ("MOA") determining certain terms related to the mobilization and installation of the crane on the M/V Caballo Azteca were agreed on December 18, 2008.

The timeline of events is set forth in greater detail in the Amended Complaint.  The bareboat charter at issue in this dispute was executed on January 23, 2009, incorporating certain terms of the MOA where not covered by a charter party (such as crane installation details), and substituting other terms pursuant to the Barecon 2001 standard charter party form (see Section II.A., infra).  On January 29, 2009 senior manager Alejandro Guarin on behalf of Defendants sent an email to Oceanografia ordering the termination of the charter.  Am. Compl. Ex. 10.[3] After receiving a formal written termination of the charter party from counsel for Oceanografia, Blake inquired into the role of CarVal in Oceanografia's affairs, but was instructed by counsel for Oceanografia not to have any contact with CarVal.  Power Declaration Ex. A.

Despite causing the breach of Oceanografia's contract with Blake in January 2009, Defendants caused their own crane vessel, the OSA Goliath to be substituted for the M/V Caballo Azteca for Oceanografia's use under the PEMEX contract.  However, because the OSA Goliath was not even available until on or about March of 2010, Oceanografia continued to incur millions of dollars in damages, accruing for each day it was unable to perform the PEMEX contract.  Despite the OSA Goliath's specifications far exceeding Oceanografia's need for the

---

[3] This email was discovered by Plaintiff later, during a deposition in another legal proceeding on August 19, 2010. Am. Compl. para. 43.

scope of services under the PEMEX contract,[4] Defendants took advantage of Oceanografia's dire economic position (the very position caused by Defendants' tortious conduct), to enter into a contract for the lease of the OSA Goliath at approximately $135,000/day, a daily rate of almost $100,000 more than Oceanografia would have paid under its contract with Blake.[5]   The OSA Goliath did not even perform the entirety of the 5-year contract, but was later substituted with a more appropriately sized and priced vessel because of the financial harm it caused Oceanografia.

After learning through industry sources of the substitution of the Caballo Azteca with CarVal's OSA Goliath vessel in the PEMEX contract, on or about January 28, 2013, Blake filed a Complaint in the New York Supreme Court, County of New York against CarVal for the tortious interference with the bareboat charter for the offshore crane barge (Index. No. 650313/2013).  At the time of the filing of the New York complaint the existence of CarVal Lux and its role in the breach was not known to Blake, nor could it have been discovered.  During discussions with in-house counsel for CarVal shortly after filing, the Amended Shareholders Agreement was provided to Blake for the first time, indicating that CarVal Lux as the shareholder was an appropriate or necessary party to be named in the action for tortious interference.   In a letter addressed to counsel for Blake, CarVal's in house counsel represented that CarVal maintained a twenty percent (20%) ownership in Oceanografia through the CarVal Lux entity, although the details or evidence of that relationship were not shown.  *See* Power Declaration Ex. B (letter dated January 31, 2013 from Dennis Weirens).  In house counsel failed to provide the original Shareholders Agreement or any alleged loan agreement despite receiving

---

[4] The complaint filed by Oceanografia against Goodcrane Corp. indicates that a 850-ton crane was all that was needed *(See* Index No. 08-3505 (S.D. Tex.) (Dkt. 1 at 3)), while industry specifications indicate the OSA Goliath was excessively outfitted and excessively manned for the PEMEX contract, thereby making it unsuitable and unnecessary for the particular functions required under the PEMEX contract.
[5] At the rate of $135,000/day Oceanografia would owe Defendants $49,275,000 per year.  Blake contracted to provide a crane barge for the entire 5 years for about the same cost.

requests from Blake.  No stock certificates were provided and no loan agreement has been provided to date.

Additionally, pursuant to New York Civil Practice Law and Rules (CPLR) 3120, in January 2013 Blake commenced discovery of third-party bank records which revealed that CarVal Lux evidenced substantial connections only with Minnesota.  The records did not give any indication which would support obtaining jurisdiction over CarVal Lux in New York.

However, as described in Blake's submissions in that action, before being served with the Complaint,[6] and while engaged in amicable discussions between counsel regarding whether the action would be voluntarily dismissed in favor of a more convenient or appropriate forum in the District of Minnesota, CarVal strategically filed an Answer to the complaint, removed the action to the United States District Court for the Southern District of New York, and actively opposed Plaintiff's motion to voluntarily withdraw the action in favor of filing in the District of Minnesota, a proper and more appropriate forum.  *See Blake Marine Group v. Carval Investors LLC*, No. 13-cv-3184 (S.D.N.Y.) (Dkt. 9, Affidavit of James H. Power).

As explained by Blake at the hearing on its Motion to Voluntarily Dismiss (13-cv-3184, Dkt. 18), the reasons for seeking to file in the District of Minnesota were concerns regarding jurisdiction over CarVal Lux, a Luxembourg entity (Dkt. 18 at pg. 10, 15-16, 45), which was an issue discovered only after the filing of the New York complaint.  At the hearing before Judge Patterson, it was noted that Minnesota has a longer statute of limitations than most states (Dkt. 18 at pg. 46-49), but that this would not be a basis to reject the dismissal (Dkt. 18 at 52-53).  It was discussed at the hearing that the three year statute of limitations under New York law had not run – Blake specifically noted that there would be legal issues ripe for briefing, particularly

_____

[6] CarVal's in house counsel, Dennis Weirens, from CarVal's global headquarters in Minnesota, contacted Blake's counsel after obtaining notice of the filing of the New York complaint via the internet and/or via a docket filing subscription.

regarding equitable tolling, which would favor Blake's position that its filing was timely. However, in the interests of judicial economy, Blake was interested in re-filing in the District of Minnesota to avoid such unnecessary briefing on this issue and on the personal jurisdiction issue, since Minnesota has substantial contacts to the dispute and its procedural statute of limitations would not bar the action. Plaintiff also noted that the convenience of the parties would also be served by the location of the evidence and witnesses. Dkt. 18 at 3.

Blake thereafter filed the present action in the District of Minnesota. In its Amended Complaint (Dkt. 8), Blake asserts that CarVal and CarVal Lux did intentionally and tortiously interfere with the Charter to Oceanografia's harm and for their own economic benefit, and that the interference was not justified by the Shareholder Agreement (Am. Compl. at para. 34, 40, 42, 60, 62, 63).

On or about January 22, 2015, Blake filed a Notice of Arbitration, formally commencing arbitration against Oceanografia for the breach of the bareboat charter pursuant to Section 35 of the charter party providing for dispute resolution in New York to be conducted by the Society of Maritime Arbitrators (SMA). The arbitration is ongoing.

### STANDARD

On a motion to dismiss, courts will assume the facts alleged in the complaint to be true and draw all reasonable inferences in the plaintiff's favor. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). The Court shall assume all facts in the complaint to be true and construe all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). A motion to dismiss should be granted only when there is no dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 12(b)(6); *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 549 (8th Cir.

2008); *Prudential Ins. Co. of America v. Metrowide Group*, No. 08-6438, 2009 WL 9110461 (D.

Minn. July 16, 2009).

## ARGUMENT

## I.     MINNESOTA LAW APPLIES TO THE TORTIOUS INTERFERENCE CLAIM

### A.     Minnesota's Statute of Limitations is Procedural and Should be Applied as the Law of the Forum

This case is governed by Minnesota law.  In Minnesota "[i]t has long been recognized

that substantive law is that part of law which creates, defines, and regulates rights, as opposed to

'adjective or remedial' law, which prescribes method [sic] of enforcing the rights or obtaining

redress for their invasion… Under Minnesota law, 'statutes of limitations relate to remedy' and

therefore are procedural, so that the period of time after accrual within which a party may bring

an action is controlled by Minnesota law if the forum is in Minnesota." *Nesladek v. Ford Motor

Co.*, 46 F.3d 734, 736-73 (8th Cir. 1995) (citing cases).

Although Carval has unnecessarily gone through a choice-of-law analysis appropriate for

substantive law, where the law at issue is procedural rather than substantive, the law of the forum

state applies.  *St Jude Medical S.C., Inc. v. Biosense Webster, Inc.*, No., A13-0414, 2013 WL

5508389 at *5 (Minn. App. Oct. 7, 2013) (citing *Danielson v. Nat'l Supply Co.*, 670 N.W.2d 1, 5

(Minn. App. 2003)).   In *Danielson*, the Court evaluated whether a statute of limitations is a

substantive or procedural question, and after reviewing the history of Minnesota cases since 1940

on this point, held that it is procedural.  670 N.W.2d at 6; *see also Cuthbertson v. Uhley*, 509

F.2d 225, 226 (8th Cir. 1975) (specifically finding that the statute of limitations is procedural in

Minnesota); *Kennecott Holdings Corp. v. Liberty Mut. Ins. Co.*, 578 N.W.2d 358, 361 n. 7

(Minn. 1998) (statute of limitations as procedural).   Accordingly, this Court's inquiry ends here

and the procedural, 6 year Minnesota statute of limitations law applies to the claim.  The breach

of contract having occurred within six years of the filing of this action, there is no dispute that the claim is timely.

**B.    Even if the Statute of Limitations Was Substantive, the Choice-Influencing Analysis Weighs in Favor of Minnesota Law**

Where a rule is substantive, the court recognizes the choice-influencing consideration approach, wherein the court shall evaluate certain factors in deciding whether to apply the law of the forum.  These include (1) predictability of result; (2) maintenance of interstate order; (3) simplification of judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law.  *Danielson*, 670 N.W.2d at 6 (citing Restatement (Second) of Conflict of Laws s. 142 cmt. e; *Jepson*, 513 N.W.2d at 470).  For the sake of completeness, even if this court found that that the statute of limitations was substantive, under the above-listed factors, Minnesota has a clear interest in applying its own law to the dispute.

In tort cases generally, predictability of result is of little relevance, because by definition, tortious events are unplanned by the victim.  Parties can therefore claim no legitimate expectation that a certain state's law would apply to a tort.  *Nesladek v. Ford Motor Co.*, 46 F.3d 734, 738 (8th Cir. 1995) (citing *Lommen v. City of East Grand Forks,* 522 N.W.2d 148, 150 (Minn. App. 1994)).  Although Defendants' attempt to distinguish tortious interference because it is allegedly based on contract (Motion at pg. 20), Defendants were not parties to that contract and therefore had no expectation regarding choice of law, and Plaintiff cannot be said to have a reasonable expectation of tortious interference by a third party.  *See Jepson*, 513 N.W.2d at 470.  Similar to *Danielson v. Nat'l Supply Co., supra*, this is not a case where advance notice of the law to apply to a future dispute.  In any event, where Defendants are Minnesota residents, they would have every expectation of being subject to Minnesota law for their actions within the state.

While the second factor, maintenance of interstate order, has also been argued to have less relevance to tort cases, it addressed whether the application of Minnesota law would "manifest disrespect" for another state's laws.  *Jepson*, 513 N.W.2d at 471.  When the factor is applied, "maintenance of interstate order [in tort cases] is generally satisfied as long as the state whose laws are purportedly in conflict has sufficient contacts with and interest in the facts and issues being litigated." *Myers v. Government Employees Ins. Co.,* 225 N.W.2d 238, 242 (Minn. 1974).  Minnesota has a substantial connection to the dispute, including Defendants' residence and principal place of business here, as well as acts giving rise to the tort claim occurring in Minnesota.  The original and amended Shareholders' Agreements were signed by Defendants' employees in Minnesota, and instructions were given to terminate the contract by senior managers in Minnesota.  While Defendants argue that this is a case of forum shopping with the purpose of benefitting from a six year statute of limitations, as explained above, the New York action was dismissed for legitimate reasons, and Defendants' and the claim's substantial contacts to Minnesota contradict any forum shopping theory.  In any event, the distinction between statutes of limitations has been found not to offend other forums under the "maintenance of interstate order" factor.  *Danielson*, 670 N.W.2d at 8.

The third factor, simplification of judicial task, while not always significant in the tort context, has increased relevance where nuances of statutes of limitations are involved. *Danielson*, 670 N.W.2d at 8.  The court in *Danielson* noted that it would be a burden for the forum state to have to "dechipher[] the intricacies of another state's statute of limitations." *Id.* This factor weighs in favor of application of the Minnesota statute of limitations by this court.

The Eighth Circuit has recognized that many Minnesota tort cases skip the analysis of the first three facts and focus primarily on advancement of the forum's governmental interests and

the application of the better rule of law.  *Nesladek v. Ford Motor Co.*, 46 F.3d 734, 738-39 (8th Cir. 1995).  It has consistently been held that the compensation of tort victims is an important governmental interest of Minnesota, and indeed the six year statute of limitations supports that theory.  "Minnesota places great value in compensating tort victims. We have even refused to apply our law when the law of another state would better serve to compensate a tort victim." *Jepson,* 513 N.W.2d at 472.  In *Danielson*, the court noted that in a tort case Minnesota's interests favor the application of its own statute of limitations and that the longer statute is considered the "better rule of law" for the compensation of tort victims.  At 9.

Although Minnesota may also have an interest in discouraging forum shopping, contrary to Defendants' assertions, Blake did not engage in forum shopping here, and deference should be given to a plaintiff's choice of forum where a Minnesota defendant is not prejudiced.  *Berquist v. Medtronic, Inc.*, 364 N.W.2d 887 (Minn. App. 1985) ("there is a strong local interest in having Minnesota residents held accountable for their actions under Minnesota tort law") (reversed on other grounds, 379 N.W.2d 508); *Frazier v. St. Jude Medical, Inc.*, 609 F.Supp. 1129 (D. Minn. 1985) (noting local interest in holding Minnesota residents accountable for their actions under Minnesota tort law, but noting other convenience factors specific to that case).  Further, the state's interest in deterring forum shopping appears not to be as strong as Defendants assert.  *See Huggins v. Stryker Corp.*, No. 09-1250, 2013 WL 1191058, *6 (D. Minn. Mar. 25, 2013) (acknowledging that Plaintiff's motion to transfer venue to take advantage of Minnesota statute of limitations was not improper) (citing *Ferens v. John Deere Co.*, 494 U.S. 516 (1990)).

II.   **THE NEW YORK CHOICE OF LAW CLAUSE CONTAINED IN THE CHARTER PARTY DOES NOT APPLY TO THE TORTIOUS INTERFERENCE CLAIM**

A.   **The Charter Party is Not Governed by New York Law, but rather U.S. Maritime Law and Subject to New York Arbitration Between Blake and Oceanografia**

Although Defendants misleadingly point to the MOA to govern the tort claim here, their assertion is unfounded.   The MOA was executed on December 18, 2008 to secure Oceanografia's commitment to a 30 month charter of the DB23 crane at the rate of $40,000/day and set forth certain terms relating to the mobilization and installation of the crane.   This agreement induced Blake to sign a Purchase and Sale Agreement for the crane barge with J. Ray McDermott Inc. on January 8, 2009, obtaining an ownership interest in the crane.

Later, on January 23, 2009, the crane charter arrangement reflected in the MOA was renegotiated and the superseding Barecon 2001 charter party form was signed by the principals. The Barecon charter party provides for New York arbitration, with the Maritime Law of the United States to apply (at Box 35).[7]   Although the Charter Party included reference to the MOA between the parties (at Box 40), Blake and Oceanografia signed the charter party contract for the lease of the crane and included additional terms as drafted in the MOA for the mobilization and re-installation of the crane on board the Caballo Azteca, where such terms were not covered in the Barecon form.   However, the charter party did include its own choice of law terms.   Only Defendants, each non-parties to the contract who were not present at its negotiation or signing argue New York law should apply to the charter party.   Eli Zatezalo of Blake and Managing Director Amado Yanez of Oceanografia understood and intended that U.S. maritime law would

---

[7] The Barecon 2001 Charter Party form is a standard set of provisions used in the maritime industry, and published by BIMCO.  Typically the parties execute the front two pages, and make selections among a certain standard terms and conditions.  In particular, with regard to choice of law, at clause 30, US maritime law and alternatively, English law are set out, and parties select the relevant clause within Box 35.  *See* Power Declaration, Ex. D (Barecon 2001 form).  Therefore, the designation "New York, USA" in Box 35 indicates New York arbitration dispute resolution as set out at clause 30, and not choice of New York law.

apply to the final contract between them, pursuant to the standard Barecon clause 30 (as referenced in Box 35). *See* Ex. 8. The rules of contract construction aim to effectuate the intent of the parties to that contract. *E.g., North Star Universal, Inc. v. Graphics Unlimited, Inc.*, 563 N.W.2d 73 (Minn. App. 1997).

Additionally, while the Charter Party provided for arbitration in New York pursuant to the SMA rules, the clause is not broad enough to encompass the tortious interference claim, and Blake has not consented to arbitrate any claim with any third party to the contract such as Defendants where it was never even aware of the relationship between Defendants and Oceanografia. *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 361 (2d Cir. 2008) (extension of an agreement to arbitrate to a third party should focus on knowledge and consent by the contract party resisting arbitration, even where third party has some element of ownership or control over one of the contractual parties).

**B.** **Any Contractual Choice of Law Provision Contained in the Charter Party or MOA Does Not Govern the Tort Claim Against Defendants**

Even if the Charter Party, MOA or Exclusive Representation Agreement were governed by New York law, here, the tortious interference claim does not involve interpretation of the contract and therefore the tort is not sufficiently related to the contract for the choice of law provision to apply.

Although Defendants cite *St. Jude Med., S.C., Inc. v. Biosense Webster, Inc.*, 994 F. Supp. 2d 1033 (D. Minn. 2014) and *Holden Farms, Inc. v. Hog Slat, Inc.*, 347 F.3d 1055 (8th Cir. 2003), these cases are distinguishable. Specifically, in *Holden Farms* the court noted that whether tortious activity occurred in that instance "requires an analysis of whether the contract included such warranties and of what the warranties meant. Thus, in analyzing the tortious behavior we are essentially analyzing the contract." 347 F.3d at 1061. In that case, the Eighth

14

Circuit clearly held that contractual choice of law clauses do not govern entities that did not sign and are not bound by the contract containing the clause. *Id.* at 1063–64.

By contrast, in *Superior Edge, Inc. v. Monsanto Co.*, 964 F. Supp. 2d 1017 (D. Minn. 2013), the Court distinguished *Holden*, and noted that the tortious interference did not involve analysis of the contractual provisions because the claim was not based on a warranty contained in the underlying contract.  *Id.* at 1033 (where the parties' Missouri choice of law provision did not apply to claim for tortious interference, and court would instead apply Minnesota law, as law of forum).

Nor under New York law would the contractual provision apply to the tort claim under the circumstances of this case.  *See Winter-Wolff Intern., v. Alcan Packaging Food & Tobacco Inc.*, 499 F. Supp. 2d 233 (E.D.N.Y. 2007) ("Under New York law, a choice-of-law provision indicating that a contract will be governed by a certain body of law does not dispositively determine the law which will govern a tort claim arising incident to a contract.") (citing cases); *see also Beatie and Osborn LLP v. Patriotic Scientific Corp*, 431 F. Supp. 2d 367 (S.D.N.Y. 2006).

In any event, if the law of the contract were to apply here, maritime law, and not New York law, would to apply to the tortious interference claim pursuant to the bareboat charter. Contrary to Defendants' assertion (Motion at 21, n.9), the equitable doctrine of laches, and not federal or state statutes of limitations would govern the time to sue under maritime law.  *Puerto Rico Ports Authority v. Umpiette-Solares*, 456 F.3d 220, 227 and n.10 (1st Cir. 2006) (citing cases, including *Puerto Rican–American Ins. Co. v. Benjamin Shipping Co. Ltd.*, 829 F.2d 281, 283 (1st Cir. 1987), cited by Defendants).  While courts will sometimes look to the limitations period contained in the "most analogous federal or state statute in order to establish the burdens

15

of proof and presumptions of timeliness and untimelieness" (*Id.*), the court merely looks at this time period as a guide in its inquiry whether there was prejudice or harm caused by the delay in filing.   *Id.*; *see also Complaint of American Export Lines, Inc.*, 620 F.Supp. 490, 514-15 (S.D.N.Y. 1985) (noting that state law is only one factor, and the laches determination is at the discretion of the court) (citing *Public Adm'r v. Angela Compania Naviera, S.A.*, 592 F.2d 58 (2d Cir. 1979).   Courts have consistently rejected a strict application of state statutes of limitations to admiralty torts.   *Moya v. Kahn*, 225 F.3d 659 (6th Cir. 2000) (applying laches rather than state statute of limitations for tort actions); *Green v. Vermillion Corp.*, 144 F.3d 332, 339-40 (5th Cir. 1998) (citing federal admiralty principles); *compare American Steamship Owners Mut. Protection and Indem. Ass'n v. Dann*, 756 F.3d 314 (4th Cir. 2014) (applying contractual choice of law statute of limitations instead of laches to contractual claims *asserted under that agreement*).   *American Steamship*, cited by Defendants, is inapplicable here to a tort claim against a third party to the contract for a tort which, as described above, does not require an analysis of the contractual provisions of the charter.

### C.       If the New York Statute of Limitations Does Govern the Claim, it Should be Tolled Due to Defendants' Efforts to Hide Their Role in the Tortious Interference

The doctrines of equitable tolling and equitable estoppel are applied to tortious interference claims in New York where plaintiff is actively mislead by defendant through misrepresentation or concealment of facts related to Defendant's wrongdoing, preventing plaintiff from discovering the nature of the claim.   *See Koch v. Christie's Int'l PLC*, 669 F.3d 141, 157 (2d Cir. 2012).   Plaintiffs must also demonstrate that they exercised due diligence in bringing the action and ascertaining the facts which might have led to the discovery of their claim.   *Id.*

16

Blake alleges that Defendants' misrepresentation and concealment of their role in the breach of the contract, as well as their equity stake or other agreements allegedly requiring the consent of Defendants for Oceanografia to enter the bareboat charter agreement did wrongfully delay the discovery of the tortious interference claimed here.   Am. Compl. para. 40-42, 60. Despite Blake's diligent efforts to determine the reasons for Oceanografia's breach, it was actively concealed from Blake that the charter was terminated due to Defendants' assertion of a violation of consent rights pursuant to an agreement.   After the breach, Blake sought to discuss the matter with CarVal's employee Alejandro Guarin, whose name appeared on correspondence concerning the crane's surveys and specifications in the days before the breach.   *See* Am. Compl. Ex. 10.   As described above, Blake was instructed by counsel for Oceanografia to refrain from contacting CarVal, who was referred to as a merely a "third party."   Power Declaration Ex. A. Defendants continued the misrepresentation through and including the filing of the New York complaint in 2013.   After the filing of that action, CarVal for the first time alleged via its in house counsel Dennis Weirens that it intentionally caused the breach of the bareboat charter on the basis of an alleged 20% ownership and consent rights in Oceanografia.   Power Declaration Ex. B.[8]   At that time CarVal produced only an Amended Shareholders Agreement between Oceanografia and CarVal Lux, an unknown entity.   Defendants declined to provide further information requested by Blake regarding the relationship between CarVal and CarVal Lux such as a management agreement between the entities or the original 2007 Shareholders' Agreement.

In any event, the above-described acts, as well as Blake's due diligence in obtaining the appropriate information regarding the relationship between Oceanografia and Defendants, are factual issues which cannot be determined on the pleadings.   *Weizman Institute of Science v.*

---

[8] Upon submission of the original Shareholders' Agreement in this action, the claimed 20% ownership interest now appears to be false - on its face the original Shareholders' Agreement allows for at most a 10% ownership interest by CarVal Lux.  Dkt. 21-1 at 5 (A-4).

*Neschis*, 229 F. Supp. 2d 234, 252 (S.D.N.Y. 2002) (refusing to make a finding on the application of equitable tolling at the motion to dismiss stage, noting that "[w]hile a statute of limitations defense may be raised in a motion to dismiss ... such a motion should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"); *see also Astor Holdings, Inc. v. Roski*, 2002 WL 72936 (S.D.N.Y. 2002) (same).

## III.   ALABAMA LAW DOES NOT APPLY TO THE CLAIM BECAUSE THE STATE'S INTEREST IS MINIMAL

Defendants propose that Alabama substantive law may apply to the tortious interference claim because Plaintiff Blake is an Alabama registered corporation and therefore under Minnesota choice of law analysis, Alabama has an interest in this case.   But a review of the totality of state contacts to the dispute demonstrates that Alabama has minimal or no connection to the dispute.   And as discussed further above (see Section I, applying Minnesota law), even if Alabama substantive law were to be applied to the interference claim, the Minnesota choice of law analysis would not apply the Alabama statute of limitations to the action – because the statute of limitations is procedural, rather than substantive, the Minnesota statute of limitations will apply and the claim is not time barred.

Defendants argue that Alabama law can be constitutionally applied to this claim because as a result of the breach Blake suffered financial injury in Alabama.   However, Blake has not alleged that any harm occurred in Alabama, and there has been no evidence presented by Defendants to demonstrate where Blake's injury occurred, despite their self-serving and unsupported statements.   Here, the injury alleged is the interference with a contract for the provision/charter of a crane barge on navigable waters in Mexico – and therefore no state has an interest which bears weight on this point.   The lack of payment from the tortious interference is a

merely "secondary injury" as in *Building Erection Services, Inc. v. JLG, Inc.*, 376 F.3d 800 (8th Cir. 2004). In that case, the court rejected that a company could only be injured at its corporate headquarters. Indeed, determining where the totality of Blake's injuries occurred as a result of the tortious interference requires fact discovery and is not properly the subject of a motion to dismiss on the pleadings here.

What is certain is where the tort was carried out. On the pleadings it is clear that the breach of the contract was caused by the Defendants, located in Minnesota, and operating out of their Minnesota office. Courts have held that "[w]hen the place of injury cannot be ascertained… the place where the defendant's conduct occurred will usually be given particular weight in determining the state of applicable law." Restatement (Second) of Conflict of Laws s. 145 cmt. e. (applied by *Club Vista Financial Services, LLC v. Maslon, Edelman, Borman & Brand*, No. 10-3174, 2011 WL 4947629 (D. Minn. Oct. 18, 2011) (noting "the place where a pecuniary injury occurs is far more difficult to locate than the place where a physical injury to a person or to a tangible thing occurs… Instead, the most critical factor in determining which state has the most significant relationship to the action is the place where the conduct causing the injury occurred. (internal citations omitted)); *see also Air Products & Chemicals, Inc. v. Eaton Metal Products Co.*, 272 F. Supp. 2d 482, 503 (E.D.Pa. 2003) ("Although [Plaintiff] may have *felt* the injury to its finances in [the state], the financial injury may have been *done* elsewhere.") (emphasis in original).

Although Defendants cite cases where the residence of the tort victim is considered, courts have merely listed the plaintiff's residence as one consideration supporting an aggregation of contacts to the forum. Defendants cite *Jepson v. General Casualty Co. of Wisconsin*, 513 N.W.2d 467, but in that case both potential states had "a significant contact or significant

aggregation of contacts, creating state interests," and the court considered the residence of both parties along with the other relevant contacts.  *Id.* at 469-70.  Here, by contrast, Alabama has no connection to the dispute beyond Plaintiff's incorporation.  There is not an aggregate of contacts to Alabama – the residence of Blake is the only contact.  As explained substantially above, the contacts with Minnesota and the interest factors under the choice of law analysis are much greater for Minnesota.

Finally, as with the application of New York law, if Alabama procedural law is applied, the statute of limitations should be equitably tolled due to Defendants' concealment of material facts that would have led to Plaintiff's discovery of the tortious interference claim.  This equitable tolling issue requires discovery and cannot be resolved on the pleadings.

## IV.   DEFENDANTS' TORTIOUS INTERFERENCE WAS NOT JUSTIFIED

The economic interest defense is a legal and factual determination to be made by this court after discovery and upon the presentation of evidence.  *St. Jude Medical S.C., Inc. v. Biosense Webster, Inc.*, No. A13-0414, 2013 WL 5508389, \*3-4 (Minn. App. Oct. 7, 2013) "Whether interference is justified is ordinarily a factual determination of what is reasonable conduct under the circumstances." *Id.* (citing *Kallok*, 573 N.W.2d at 362).  Plaintiff has sufficiently alleged that Defendants have no economic interest justifying their tortious interference with the bareboat charter, which was done wrongfully and for the purpose of benefitting Defendants to the detriment of Oceanografia and Blake.

### A.   Defendants Had No Legal Right or Economic Interest Justifying Their Tortious Interference

Blake has sufficiently alleged under Minnesota law that Defendants tortiously interfered with the bareboat charter.  Under Minnesota law, the elements of tortious interference are, 1) the existence of a contract; 2) the alleged wrongdoer's knowledge of the contract; 3) intentional

20

procurement of its breach; 4) without justification; and 5) damages. *Kallok v. Medtronic, Inc.*, 573 N.W.2d 356 (Minn. 1998).

Blake specifically alleged that Defendants' tortious inference with the contract was without justification.

> No contract or other agreement was in place between Oceanografia and Carval and CarVal Lux at the time of Carval's and Carval Lux's tortious interference which required Oceanografia to obtain the consent of Carval and Carval Lux to enter in the Charter.

Am. Compl. at para. 42.

> The transactions between Blake and Oceanografia were not contingent or in any manner based on, or subject to the express approval of financing by CarVal, CarVal Lux or any other CarVal affiliate including but not limited [to] any Luxembourg fund controlled by CarVal…

Am. Compl. at para. 60.

> Thereafter, Defendants CarVal and CarVal Lux jointly and severally intentionally, maliciously *and without privilege or cause to do so*, wrongfully and intentionally induced Oceanografia to breach its agreements with Blake as aforesaid…

Am. Compl. at para. 62 (emphasis added).

> To the extent that Carval and/or CarVal Lux claims to have acted pursuant to a shareholder agreement, the acts of CarVal and/or CarVal Lux forming the bases of the Plaintiff's claim for tortious interference were outside the scope of any alleged shareholder agreement…

*Id.* at para. 63. *See also* paras. 34, 40. These allegations, taken together, are sufficient to meet the pleading standards required where an important aspect of the claim is the lack of transparency by Defendants as to their ownership interest and other rights with respect to Oceanografia.

Justification is an affirmative defense requiring a factual determination of what is reasonable conduct under the circumstances; it will only provide the basis for dismissal under

Rule 12(b)(6) if the justification is apparent on the face of the complaint.  *Select Comfort Corp. v. Sleep Better Store, LLC*, 838 F. Supp. 2d 889, 893 (D. Minn. 2012) (finding justification obvious based on legal interests under well-settled trademark law).

Defendants first must show that they had a legal or contractual right to interfere with the contract.  *See Kallok v. Medtronic, Inc.*, 573 N.W.2d 356 (Minn. 1998) (burden of proving justification is on the defendant).   Although Defendants have presented an Amended Shareholders Agreement entered into solely by CarVal Lux (CarVal Investors LLC is not a party to the agreement and is not an alleged shareholder of Oceanografia), which provides for consent rights "so long as CarVal [Lux] holds at least 5% (five per cent) of the capital stock of Oceanografia…"  Dkt. 21-1 at 45 (A-44), there is no evidence that either Defendant held a 5% ownership in Oceanografia such that these consent restrictions were valid and binding.   No underlying credit agreement or issuance of shares has been produced.

Further, even assuming CarVal Lux was a 5% owner of Oceanografia, there has been no determination that such an agreement is valid and enforceable under Mexican law (see Clause 23 selecting Mexican choice of law, at Dkt. 21-1 at 31-32 (A-30-31)) or whether it is invalid because it was overly restrictive and would cause Oceanografia to be economically crippled and prevented from profitably continuing the operation of its business.

Finally, when Blake was engaged by Oceanografia to negotiate on its behalf to secure an appropriate crane barge, the original 2007 Shareholders' Agreement was in place, which provided for Defendants' consent for transactions over $50,000,000.00 (which the original charter did not exceed at $40,000/day for 30 months).   Whether the original or Amended Shareholders' Agreement applied to the contractual relationship already in place is a determination to be made by this Court based on facts subject to future discovery.

Defendants further have no economic interest based on CarVal Lux's purported shareholding or status as creditor of Oceanografia.   Defendant CarVal has no direct economic interest in Oceanografia itself, and co-defendant CarVal Lux has alleged a mere 5% shareholding which ceased just weeks after the tortious conduct occurred (this 5% ownership has not even been substantiated by any loan agreement between the parties).   Power Declaration, Ex. C (Payoff Letter dated April 14, 2009).   Defendants cite no law to support the proposition that a 5% ownership interest constitutes sufficient economic interest to justify its tortious interference. In Minnesota, recognizing that subsidiary and parent interests can often be aligned, courts have applied the economic interest justification solely to 100% wholly-owned subsidiaries.   *James M. King and Associates, Inc. v. G.D. Van Wagenen Co.*, 717 F.Supp. 667 (D. Minn. 1989) (finding that a parent is justified in interfering with the contracts of its wholly-owned subsidiary); *United States v. R.J. Zavoral & Sons, Inc.*, 894 F. Supp. 2d 1118 (D. Minn. 2012) (limiting justification to wholly-owned subsidiaries, and rejecting justification with respect to a 50/50 joint venture); *see also Cambio Health Solutions, LLC v. Reardon*, 213 S.W.3d 785 (Tenn. 2006) (noting nationwide cases applying justification to 100% owned subsidiaries, and the lowest ownership where justification was applied involved 66.6% ownership).   Here the alleged ownership by CarVal Lux of 5%, and the complete lack of ownership by defendant CarVal does not even come close to establishing a level of ownership which would indicate the alignment of economic interests for which this justification was intended.   Indeed, the interests of the companies were not aligned at all – the breach of Oceanografia's contract with Blake caused it tens of millions in damages, while allowing Defendants to benefit from the charter of their own crane vessel in its place.

**B.     The Shareholders' Agreement is Irrelevant Where Defendants Used Improper Means to Tortiously Interfere with an Executed Contract and Cause Harm to Oceanografia for Their Own Benefit**

Even if the Shareholders' Agreement is found valid and enforceable under Mexican law, Defendants used improper means to interfere with the bareboat contract and the facts as alleged demonstrate Defendants' bad faith purpose for interfering.  *See Northside Mercury Sales & Service, Inc. v. Ford Motor Co.*, 871 F.2d 758 (8th Cir. 1989) (listing factors suggesting improper conduct under Minnesota law); *Harman v. Heartland Food Co.*, 614 N.W.2d 236 (Minn. App. 2000) (defining improper means to include misrepresentation of facts).  Defendants knew about Oceanografia's need for the bareboat charter for the crane at issue, and that without it Oceanografia was incurring substantial damages on a daily basis under the PEMEX contract. Am. Compl. para. 12-14.  "Tortious interference is not justified when a plaintiff demonstrates that the defendant had knowledge of facts which, if followed by reasonable inquiry, would have led to a complete disclosure of the contractual relations and rights of the parties." *St. Jude Medical S.C., Inc. v. Biosense Webster, Inc.*, A13-0414, 2013 WL 5508389, *3-4 (Minn. App. Oct. 7, 2013) (quotation omitted); *see also Twitchell v. Glenwood–Inglewood Co.*, 131 Minn. 375, 381, 155 N.W. 621, 623 (1915) (holding that the law will impute bad faith when the wrongdoer has knowledge that the contract existed).  Defendants further had knowledge of the present contract, evidenced by its requests for surveys of the crane and other involvement in the transaction.  Am. Compl. para. 58, 61.

Defendants have failed to demonstrate that the Agreement provides a justification of a five percent shareholder to cause the breach of an executed contract in order to substitute a more expensive crane vessel to the detriment of Oceanografia and for the benefit of itself. "Interference is unjustifiable when it is done for the indirect purpose of injuring the plaintiff or benefiting the defendant." *Furlev Sales & Assocs., Inc. v. N. Am. Auto. Warehouse, Inc.*, 325 N.W.2d 20, 27 (Minn. 1982); *Potthoff v. Jefferson Lines, Inc.*, 363 N.W.2d 771, 776 (Minn. App.

1985).  As outlined above, Defendants caused the breach of the bareboat charter in order to substitute its own crane vessel at a significantly higher charter rate several months later for its own direct benefit.  Am. Compl. para. 64-67.  Not only did this harm Oceanografia by causing it to enter into a higher rate charter, but this increased damages to Oceanografia for the months of delay in its ability to perform under the PEMEX contract using the M/V Caballo Azteca.  Defendants clearly were not interested in the long-term economic interests of Oceanografia - indeed, just a few months later, after preventing Oceanografia from chartering the crane it needed, the alleged ownership and/or economic interest by CarVal Lux was terminated and the underlying loan agreement repaid.  Power Declaration Ex. C (Payoff Letter dated April 14, 2009).  Under this loan payoff, Defendants further forced Oceanografia to marshal much-needed assets for company operations and the charter of a crane vessel for the PEMEX contract, and diverted their use towards questionably payment of approximately $61 million to CarVal Lux on its debt.

## V.  MOTION FOR A MORE DEFINITE STATEMENT

### A.  Rule 9(b) Pleading Standards Are Not Implicated Here Where Plaintiff's Claim Does Not Allege Fraudulent Acts as an Element of Tortious Interference

Defendants' assertion that the allegations contained in the Amended Complaint for tortious interference must be governed by the pleading standards of Fed. R. Civ. P. 9(b) is false, where here, Blake has alleged that Defendants' tortiously interfered with the Barecon charter without justification.   Many tortious interference claims make similar allegations to those contained in the Amended Complaint, and are not held to a Rule 9(b) pleading standard.  As Defendants note, "whether [Rule 9(b)] applies will depend on the plaintiffs' factual allegations." *See* Motion at 29, citing *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007); *see also Am. Traffic Solutions, Inc. v. B & W Sensors, LLC*, 2014 WL 1272509 (E.D.Mo.

2014); *Merrill Lynch, Pierce, Fenner & Smith, P.C. v. Greystone Servicing Corp.*, No. 06-0575, 2007 WL 2729935, at * 14 (N.D. Tex. Sept. 18, 2007) (concluding that Rule 9(b) should not be applied to claims for tortious interference unless those allegations are "intertwined" with allegations of fraud).

Blake's tortious interference allegations are not intertwined with fraud such that they should be pled according to the Rule 9(b) standard. Blake establishes the lack of justification element by alleging improper means and bad faith motive sufficient to invalidate any alleged economic interest or right by Defendants' to interfere with the contract. Improper means can include a wide range of wrongful conduct, including mispresentation, which does not rise to the level of fraud (s*ee Harman v. Heartland Food Co., supra.*). Defendants should have pursued their remedies in Mexico under the purported Amended Shareholders' Agreement rather than to terminate the valid and binding contract between Blake and Oceanografia in order to harm Oceanografia and gain an economic benefit for itself. Blake's allegations concerning Defendants' wrongful concealment of their relationship with Oceanografia pursuant to the Shareholders' Agreement similarly does not rise to fraud.

**B.     The Amended Complaint is Not Vague and Ambiguous as to Require a More Definitive Statement Under Rule 12(e)**

Under Federal Rule of Civil Procedure 12(e) "[a] party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." Because of the liberal notice-pleading standard governing federal pleadings "and the availability of extensive discovery, Rule 12(e) motions are disfavored." *Radisson Hotels Int'l, Inc. v. Westin Hotel Co.*, 931 F.Supp. 638, 644 (D.Minn. 1996). "Rule 12(e) provides a remedy for unintelligible pleadings; it is not intended to correct a claimed lack of detail." *Id.* (internal quotation marks omitted). Therefore,

"[w]hen examining whether a more definite statement is required under Rule 12(e), the only question is whether it is possible to frame a response to the pleading." *Lyon Fin. Sers., Inc. v. MBS Mgmt. Servs., Inc.*, No. 06–4562, 2007 WL 2893612, at *9 (D. Minn. Sept. 27, 2007) (citing *Century '21' Shows v. Owens*, 400 F.2d 603, 607 (8th Cir. 1968)).

The Amended Complaint filed in this action does not come close to being unintelligible. Indeed, Defendants were able to frame a response in the form of a Motion to Dismiss which tracked the allegations contained in the Amended Complaint, demonstrate a clear understanding of the claim made by Blake.  The ability to respond through motion practice and even provide additional documents relevant to the dispute (*see* Kahnke Declaration, Dkt. 21) is a substantial indication that a more definite statement is not needed.  *See Ransom v. VFS, Inc.*, 918 F.Supp. 2d 888 (D. Minn. 2013) (where a responsive pleading had already been filed, Rule 12(e) motion denied).  The request for a more definitive statement should be denied.

## CONCLUSION

Based on the foregoing, Defendants' Motion to Dismiss should be denied.

Dated:  May 20, 2015                              **CHESTNUT CAMBRONNE PA**


                                        By  _/s/ **Karl L. Cambronne**_____
                                             Karl L. Cambronne (#14321)
                                             kcambronne@cclawmn.com
                                             Brian N. Toder (#17869X)
                                             btoder@cclawmn.com
                                             17 Washington Avenue North, Suite 300
                                             Minneapolis, MN 55401
                                             (612) 339-7300
                                             Fax (612)336-2940

                                             HOLLAND & KNIGHT LLP
                                             James H. Power, *admitted pro hac vice*
                                             james.power@hklaw.com
                                             Marie E. Larsen, *admitted pro hac vice*
                                             marie.larsen@hklaw.com
                                             31 West 52nd Street
                                             New York, NY  10019
                                             (212) 513-3494
                                             Fax (212) 385.9010

                                             *Attorneys for Plaintiff Blake Marine Group, Inc.*